Filed 6/2/16  P. v. Saucedo CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSE ANTONIO SAUCEDO,<br><br>    Defendant and Appellant. | F068999<br><br>(Kings Super. Ct. No. 13CM1836)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County.  Robert S. Burns, Judge.

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Kevin L. Quade, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Appellant/defendant Jose Saucedo was charged with 18 felony counts for sexually assaulting the daughter of a woman who allowed him to live in her house. The victim testified she was 13 years old when the alleged assaults began, and described a series of sexual assaults where defendant raped her and forced her to perform acts of oral copulation. The assaults ended when she was 14 years old.

After a lengthy jury trial, defendant was convicted of count XIII, rape of a child under the age of 14 years (Penal Code, § 269, subd. (a)(1));[1] and count XVII, forcible rape (§ 261, subd. (a)(2)). He was found not guilty of count XII, kidnapping to commit lewd or lascivious acts (§ 209, subd. (b)(1)). The jury was unable to reach verdicts on the remaining fifteen counts, and the court declared a mistrial and granted the prosecution's motion to dismiss the charges. Defendant was sentenced to 15 years to life for count XIII, plus 11 years for count XVII.

On appeal, defendant challenges several of the court's evidentiary rulings. He contends the court should have excluded the testimony of the victim's mother about statements he made regarding his alleged sexual interest in the victim's teenage friend. He also contends the court should have excluded a portion of his postarrest statement to a detective where he claimed to have a collection of women's underwear. Finally, defendant asserts his defense counsel was prejudicially ineffective for failing to object to an expert's testimony about child sexual abuse accommodation syndrome (CSAAS) and studies about the low rate of false reports.

We will review the victim's testimony about all the charged offenses, even those which were subsequently dismissed as a result of the mistrial, because it is relevant to the court's pretrial evidentiary rulings challenged by defendant. We affirm.

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

## FACTS

In 2006, Karen S. met defendant when they both worked at Home Depot. They became friends but eventually worked at other places.

In January 2012, Karen S. ran into defendant. Defendant said he had broken up with his girlfriend, Delila Hernandez, and had no place to live. Defendant and Hernandez had a two-year-old child. Defendant told Karen he was trying to get partial custody of his child, and he needed a place to live. He asked if he could move in with Karen and said he would pay rent. Karen agreed to rent a room in her house to defendant.

In February 2012, defendant moved into Karen's house. Karen lived with her two children: her 13-year-old daughter, K. (the victim), and a seven-year-old son. Karen's 73-year-old mother also lived with them.

Karen testified she trusted defendant completely with her children. Karen talked with her children about defendant moving into the house, and they agreed with her decision. Karen also testified that before defendant moved in and met her children, "I told him my daughter looks older than what she is, and I don't want him looking at her joking with her in any way, or me and him were going to have problems."

Defendant regularly lifted weights and was a body builder. Defendant slept in the bedroom previously occupied by Karen's young son. Her son moved into his grandmother's bedroom, directly across the hall from defendant. K. had her own bedroom.

After defendant moved into Karen's residence, Karen and defendant began a sexual relationship, usually when Karen's children were staying with their father.[2]

---

[2] Karen testified that her ex-husband, and the father of her children, frequently stayed overnight to spend time with them. In December 2011, however, Karen asked her ex-husband to stop staying overnight. When defendant moved in, her ex-husband was jealous and believed something was going on between them.

Defendant paid rent to Karen for about two months.  He lost his job and Karen let him stay without paying rent with the understanding that he would resume rent payments when he got another job.

The instant case was based on K.'s revelation that defendant sexually assaulted her on numerous occasions between March and November 2012, beginning when she was 13 years old and ending when she was 14 years old.  The prosecution presented the evidence based on a series of separate incidents with multiple counts charged for each incident.

**The First Incident:  K's Bedroom (Count I)**

K. testified the first incident occurred when she was 13 years old.  One evening around 11:00 p.m., K. was asleep in her bedroom.  She woke up and found defendant standing over her bed and staring at her.  Defendant pulled up K.'s shirt and stared at her breasts for about three minutes.  K. was shocked and stared back at him.  Defendant left the room without saying anything.

Based on this incident, defendant was charged with count I, commission of a lewd and lascivious act on a child under the act of 14 years (§ 288, subd. (a)).  The jury was unable to reach a verdict and the court declared a mistrial.

**The Second Incident:  The Laundry Room (Counts II and III)**

K. testified that about a week later, she got up between 5:30 a.m. and 6:00 a.m. She went in the laundry room to get clothes for school.  Defendant entered the laundry room and closed the door.  He pushed K. against the dryer and held her shoulders with his hand.  Defendant pulled down both their shorts, and rubbed his penis against her vagina.  After about five minutes, defendant stopped and cried, and told K. not to say anything because he would lose his child.  Defendant also said, " '[I]f anybody asks, you wanted it.' "

Defendant was charged with count II, commission of a lewd and lascivious act by force or violence on a child under the age of 14 years (§ 288, subd. (b)(1)) and count III,

commission of lewd and lascivious act on a child under the age of 14 years. The jury was unable to reach verdicts on these charges, and the court declared a mistrial.

## The Third Incident: Defendant's Bedroom (Counts IV, V, VI, and VII)

K. testified the next incident happened a week or two later. K.'s mother and her brother were not home. K. was sitting in the living room. Defendant said he wanted to show her something. She followed defendant into his bedroom. Defendant closed the bedroom room. He pushed his dresser in front of the doorway and "barricaded" his door so that she could not leave.

Defendant pushed K. down onto his bed and used one hand to pin both her arms above her head. K. resisted and told defendant to stop. Defendant was strong, and K. was afraid he would hurt her.

Defendant pulled down K.'s shorts. He tried to perform an act of sexual intercourse, but it was difficult and he became frustrated. K. was crying and told him to stop. Defendant kept staring at her and eventually performed the act of intercourse. K. felt terrible pain in her vagina.

Defendant stopped and cleaned his body with a towel. He moved the dresser away from the door. As he walked out of his bedroom, he again warned K. not to tell anyone because he would lose his child, and to tell anyone who asked that she " 'wanted it.' "

At the time of this incident, K. testified her grandmother was asleep in her bedroom across the hall, but the television volume was turned up high.[3] K. did not scream for help because she was afraid her father later would find out, and he would kill

---

[3] Karen testified her mother had hearing problems, she usually turned up the volume on her bedroom television so it was extremely loud, and she frequently left the television on all night. Karen's mother suffered from sleep apnea and needed to wear a special mask and machine that made a humming noise when she slept. Defendant and K. were often left alone when Karen took her mother to the doctor, and when Karen's mother was hospitalized for extended periods in November and December 2012.

defendant and go to prison. K. testified that throughout her childhood, her father always said he would kill anyone who touched K. or her brother.

Defendant was charged with count IV, rape of a child under the age of 14 years (§ 269, subd. (a)(1)); count V, unlawful sexual intercourse on a child under 14 years of age (§ 261, subd. (a)(2)); count VI, commission of a lewd and lascivious act by force or violence on a child under the age of 14 years; and count VII, commission of a lewd and lascivious act on a child under the age of 14 years. The jury was unable to reach verdicts on these charges and the court declared a mistrial.

**The Fourth Incident:  Defendant's Bedroom Floor (Counts VIII, IX, X, XI, and XII)**

K. testified the next incident happened a week or two later. K.'s grandmother was the only person at home. K. was playing video games in the living room. Defendant walked in and stared at her. K. became worried that he was going to rape her again, and she started to leave the room. Defendant chased K. around the couch. He grabbed her wrist and pulled her to his bedroom. K. told defendant to stop and let her go. She tried to resist, and scratched at the hallway walls.

Defendant pulled K. into his bedroom, and again used his dresser to barricade the door. K. tried to get away from him. Defendant backed K. into the corner. She fell backwards onto the floor and was trapped. Defendant pulled off almost all her clothes and raped her. K. suffered tremendous pain and bleeding.

When he finished, defendant again cried and told her not to tell anyone. Defendant cleaned himself with a towel, moved the dresser away from the door, and let K. leave.

Defendant was charged with count VIII, rape of a child under the age of 14 years; count IX, unlawful sexual intercourse on a child under 14 years of age; count X, commission of a lewd and lascivious act by force or violence on a child under the age of 14 years; count XI, commission of a lewd and lascivious act on a child under the age of

6.

14 years; and count XII, kidnapping to commit rape and/or a lewd act (§ 209, subd. (b)(1)).

Defendant was found not guilty of count XII, kidnapping to commit rape and/or a lewd act. The jury was unable to reach verdicts on the other counts and the court declared a mistrial.

## The Fifth Series of Incidents: Sexual Assaults Just Before K. turned 14 Years Old (Counts XIII, XIV, XV)

K. testified about several sexual assaults which occurred just before she turned 14 years old. A few weeks after being dragged into his bedroom, defendant asked her to watch his two-year-old son while he went to the gym. When defendant returned, he asked K. to carry the sleeping child to his bedroom. As K. placed the child on the bed, defendant closed the door, moved the dresser, and barricaded the door.

Defendant pushed K. onto the bed and performed an act of sexual intercourse, even though his child was lying on the same bed. K. cried and asked him to stop. Defendant ignored her. K. did not suffer any bleeding this time.

When he finished, defendant again told her not to say anything and to claim that she "wanted it."

K. testified about an incident that occurred two or three weeks later, just before her 14th birthday. K. testified it happened in defendant's bedroom, but she could not remember how he lured her inside. He crawled on top of her. K. gave defendant a condom that she got at school. K. convinced defendant to wear it because she was worried about becoming pregnant or contracting a sexually transmitted disease.[4] Defendant put on the condom and again performed an act of sexual intercourse.

Defendant was charged and convicted of count XIII, rape of a child under the age of 14 years, committed between March 1 and August 26, 2012, (§ 269, subd. (a)(1)).

---

[4] K. testified that she complained to her mother about inconsistent and missed periods. Karen assumed that K.'s body was going through maturation changes.

7.

The jury was unable to reach verdicts on count XIV, unlawful sexual intercourse by force or violence; and count XV, commission of a lewd and lascivious act by force or violence on a child under the age of 14 years, and the court declared a mistrial on these charges.

## Oral Copulation (Count XVI)

K. testified the day after her 14th birthday, she was playing video games in her bedroom. Defendant walked in and told K. to orally copulate him. K. refused and said that was gross. Defendant said he would get on top of her if she refused.

Defendant lowered his shorts, grabbed the back of K.'s head, and pushed her head against his body. Defendant forced her to perform multiple acts of oral copulation. He kept pushing her head against his penis and she gagged. Defendant finally stopped and left the bedroom.

Defendant was charged with count XVI, oral copulation of a child over the age of 14 years by force or violence (§ 288a, subd. (c)(2)(C)). The jury was again unable to reach a verdict on this charge and the court declared a mistrial.

## Sexual Assaults After K.'s 14th Birthday (Counts XVII and XVIII)

K. testified that after her 14th birthday, defendant raped her in his bedroom every two or three weeks. K. testified some of these incidents occurred while her grandmother was the only other person in the house, but her television was always turned up loud. No one was home for the other incidents.

K. described one incident where defendant was raping her in his bedroom and her mother suddenly returned home. Defendant jumped off K., moved the dresser away from the bedroom door, pushed her into the hallway, and then he hid in his bedroom closet.

K. testified her private area was painful for days after each rape, but she did not try to get any medical help because she did not want her parents to find out.

8.

In addition to the sexual assaults, defendant inappropriately touched her body whenever she walked by him. K. testified the last time defendant sexually assaulted her was in November 2012.

Defendant was charged and convicted of count XVII, unlawful sexual intercourse on a child 14 years of age or older, committed between August 28 and November 30, 2012, (§ 261, subd. (a)(2)). The jury was unable to reach a verdict on count XVIII, which alleged the same offense, and the court declared a mistrial.

## DEFENDANT'S STATEMENTS ABOUT K.'S FRIEND

Karen testified about an incident that occurred while defendant was living at her house. K. was 13 or 14 years old. K. and her 17-year-old friend, T., were flag girls in their school's color guard and band. The girls had to wear tight fitting uniforms, and they did not like them. T. frequently stayed overnight with K. after practice.

After one such sleepover, Karen and defendant drove both girls to T.'s apartment. The girls were talking about how the uniforms were ugly and did not like them. Karen testified that they arrived at T.'s apartment and both girls got out of the car. Karen testified that as defendant watched the girls walk away from the car, he said, "[I]f I was [T.'s] age I would be all up in that." Karen was shocked by defendant's statement, and asked why he would say something like that because it "could get you in trouble."

Karen testified defendant was "like kind of excited. He had sat with his legs crossed, and he had put his leg down and was moving around and was excited, and he crossed his leg back-up…." Defendant added, " '[I]f I was that age, I would be tapping that.' " He also said that "he liked black women with big butts."[5]

---

[5] In issue I, *post,* we will address defendant's contention that the court abused its discretion when it denied his motion to exclude Karen's testimony about his remarks regarding T.

**Defendant Moves Out**

Sometime in August 2012, while defendant lived at Karen's house, he resumed his relationship with Delila Hernandez, his former girlfriend and the mother of his child. Hernandez visited Karen's house three times and had sex with defendant in his bedroom when everyone else was asleep. Hernandez testified she never met K. when she visited Karen's house.

Toward the end of 2012, Karen spent a lot of time in San Francisco because her mother was in the hospital there. She did not see defendant very much.

In February or March 2013, defendant moved out of Karen's house and moved back with Hernandez. Karen was out of town when he left. Karen later learned he had reconciled with Hernandez and had been giving her money.

## K. DISCLOSES THE MOLESTATIONS

In May 2013, K. was on the school bus with her friend, R. They heard other students talking about sex, and R. asked K. if she was a virgin. K. held back tears and said no, and told R. that she had been raped. R. was shocked and tried to help K. They talked for the next few days, and K. told her that "there was a guy that was living in her house that was a friend of her mom's and one day he decided to rape her." K. did not reveal the man's name.

R. spent the following month trying to convince K. to tell her mother about the rapes. K. told R. the rapes made her feel "dirty." However, K. refused to tell because she was afraid her father would "overreact," and that something would happen to the perpetrator's child. R. said she was going to tell Karen if K. refused. K. finally sent a text message to R., that she was going to tell her mother.

About a week later, K. and Karen went on a walk together. K. started to cry and whispered to Karen that defendant raped her. Karen was shocked and K. kept crying. K. did not give any details and did not tell Karen when it happened. Karen immediately

10.

drove K. to the hospital because she thought they could collect DNA evidence. Karen called the sheriff's department as she drove to the hospital.

While K. was being examined at the hospital, Karen called her ex-husband (K.'s father) and told him what happened. She also called friends to meet her ex-husband at the hospital because she was afraid about how he was going to react. Karen testified her ex-husband did not like defendant, and he was upset that Karen made him leave when she began her relationship with defendant. Karen was also afraid her ex-husband would do something to defendant because "he told my kids and me since my kids were born that if anyone ever hurt his children that he would kill them…."

**The Initial Investigation**

Deputy Seth Cardoza met K. and her mother at the hospital. Cardoza spoke with K. for 40 minutes. K. was upset, and she hesitated to answer Cardoza's questions in detail. As the conversation continued, however, K. gave more details and said defendant repeatedly raped her.

A nurse conducted a sexual assault examination on K. K. revealed the details of the sexual assaults to both Cardoza and the nurse. K. said defendant sexually assaulted her between March and November 2012. Defendant did it once every other month, and it happened in her brother's bedroom.[6] K. said defendant held her down by her wrists, and might have dragged her. K. said defendant held her hand and made her walk to his room. K. said the sexual assaults included kissing on the mouth, oral copulation, and vaginal penetration by defendant's fingers and penis.

The results of K.'s physical examination showed no injuries or affirmative evidence of sexual assault. The nurse explained the results were not surprising since it had been six months since the final sexual assault. The nurse testified K.'s physical

---

[6] Defendant's bedroom had been used by K.'s brother before defendant moved in.

11.

examination was not inconsistent with the allegations, but also consistent with her age and maturity levels.

**K.'s Multi-Disciplinary Interview Center Statement**

On May 7, 2013, K. was interviewed by an investigator from the district attorney's office. The interview was videotaped and played for the jury. Deputy Cardoza monitored the interview from another room, and testified K.'s statements were consistent with her initial statements to him.

K. said the first incident happened when defendant stared at her breasts in her bedroom. She said another incident occurred when he rubbed his penis against her vagina in the laundry room. K. said defendant raped her when he lured her into his bedroom, blocked the door with his dresser, and pinned her against the bed. Defendant was frustrated when he could not penetrate, and it hurt when he finally did so.

K. described the other sexual assaults, including incidents where defendant chased and dragged her into his bedroom; he wore a condom when he raped her; and defendant hid in a closet. She also described how defendant forced her to perform an act of oral copulation just after her 14th birthday.

K. was asked why she did not report defendant's conduct. K. said her father had once sworn that he would kill anyone who touched his children. K. was afraid her father would kill defendant and go to prison. K. finally told her mother after being convinced by her friend.

## DEFENDANT'S POSTARREST STATEMENT

Defendant was arrested and taken into custody. Detective Robert Balderama interviewed defendant at the police department. He advised defendant of the *Miranda*[7] warnings, and defendant agreed to answer questions.

---

[7] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

Detective Balderama asked defendant why he moved out of Karen's house. Defendant gave three different answers: He had resumed his relationship with his former girlfriend; he was scared that Karen's ex-husband would find out about his sexual relationship with Karen and kill him; and K. flirted with him and made him feel uncomfortable.

Defendant said he owed rent to Karen, but he never said that Karen forced him to leave because of the debt. Defendant said he had sex with other women in Karen's house at night when everyone was asleep.

When advised of the charges, defendant denied having sex with K., and said K. never asked to have sex with him.

Detective Balderama asked defendant to explain what K. did to make him feel uncomfortable. Defendant replied: " 'I am a 36 year old man, I know when somebody is trying to flirt or get my attention. I know that little girl tried a couple times to get my attention.' " Defendant called K. a "little girl" throughout the interview.

Detective Balderama asked defendant why K. would fabricate allegations against him. Defendant said K. was miserable living with her mother, and she wanted to be able to leave.

Detective Balderama testified that during the interview, he gave false information to defendant as a ruse to see his reaction. Balderama falsely told defendant that his semen was found in K.'s underwear, and asked how his DNA could have been found there. Defendant replied that he kept a collection of panties in his bedroom drawer, and his semen was on them. Defendant first said he had three pairs, and then said he had four pairs, and they were from four different women.[8] Defendant said his underwear

---

[8] At trial, Delila Hernandez testified that when they resumed their romantic relationship in August 2012, defendant asked for her underwear three separate times after they spent the night together. Defendant never told Hernandez that he had underwear from other women.

collection had disappeared one time.  Defendant said he later found the panties in K.'s room.  Defendant also said his semen could have been taken from a towel he used to masturbate in his bedroom.[9]  Defendant also said he had sex with Karen all over the house, including in K.'s bedroom.

As the interview continued, defendant said K. had walked into the bathroom while he was taking a shower on one or two occasions and seen his naked body.  He told K. that it was inappropriate to walk in while he was in the bathroom.  Later in the interview, however, defendant contradicted his statement and said K. had never walked into his room and seen him without clothes.

Detective Balderama asked defendant if he would submit to a DNA test.  Defendant initially said yes.  Balderama left the interview room to get a testing kit.  While he was alone, defendant vomited in the corner of the room.  When Balderama returned, defendant refused to give a DNA sample and told him to take a sample from his vomit.

After the interview, defendant complained of chest pains and his blood pressure was too high.  He was taken to the hospital and passed out in the patrol car.  He was treated and released, and booked into jail.

**Testimony From Jailhouse Informant**

Michael Roddy (Roddy) testified for the prosecution.  Defendant and Roddy were in jail together prior to defendant's trial.  Roddy testified his cell was directly below defendant's cell.  Roddy and defendant talked a "handful of times" through a connecting vent.  The same vent allowed Roddy to talk to inmates housed above and next to his cell.

Roddy testified that one night around 11:45 p.m., he had finished talking with one of his neighboring cellmates when defendant started talking to him.  Defendant talked

---

[9] In issue II, *post,* we will address defendant's argument that the court abused its discretion when it allowed the prosecution to introduce that portion of the interview where defendant said he kept a collection of women's panties.

14.

about the charges against him, and said he had a sexual relationship with the victim's mother while he was a tenant in their house. Defendant said the woman lived with her mother, a boy, and the victim. He never said the victim's name.

Roddy testified that defendant confessed to him and said: " 'You know I am a good guy, but I did this, but I am a good guy.' " Defendant was slightly depressed and "down." It seemed like defendant wanted to get something off his chest. Defendant said the victim had come on to him. She intentionally stayed home with him when the family left the house, and she wore "skimpy clothing to kind of flaunt herself in front of him." Defendant told Roddy that she was "a very pretty girl with big breasts and a nice … ass."

Defendant told Roddy the victim complained of discomfort, she was taken to the hospital, and a doctor said it looked like she might have been raped. Defendant said it could not have looked like rape because they had consensual sex, and if "they're going to get me with anything, they're going to get me with sex with a minor." Defendant believed the charges were filed against him because he did not pay rent when he lived at the victim's home.

Roddy testified they talked about defendant's defense. Defendant said his friend had visited the house and saw how the victim acted in front of defendant. Defendant also said the victim's grandmother lived in the next bedroom, and she would have seen or heard something. Defendant mentioned something about moving a dresser, and wondered why they did not find any DNA on the dresser if he moved it.

Roddy testified that at the time he talked with defendant, Roddy was in jail because he had pleaded guilty to two counts of sexual battery on two different minors, and one count of making criminal threats to one of those minors. The plea was an open sentence and he hoped to get probation. He was waiting for his sentencing hearing when he talked to defendant.

Roddy testified he did not receive any offers from the district attorney's office in exchange for his testimony against defendant. He came forward because defendant later

15.

acted like he had not confessed to him. Defendant also belittled Roddy and other inmates who faced similar charges of having sex with minors.

On cross-examination, however, Roddy conceded that he disclosed defendant's statements to his own attorney on August 13, 2013, the day of his scheduled sentencing hearing. He knew the probation report had recommended a prison sentence instead of probation. As a result of his disclosure, Roddy's sentencing hearing was continued, and the investigator from the district attorney's office interviewed him that day about defendant's statements. By the time of defendant's trial, Roddy had received a supervised own recognizance release pending a future sentencing hearing.

**Expert Testimony**

Dr. Anthony Urquiza, a clinical psychologist at University of California Davis, testified as the prosecution's expert on child sexual abuse accommodation syndrome (CSAAS). He explained that CSAAS is an educational tool to explain how children respond to the dynamics of a sexually abusive relationship. There are five components: secrecy; helplessness; entrapment and accommodation; delayed and unconvincing disclosure; and retraction or recantation.

Dr. Urquiza testified that secrecy addresses the situation that most sexually-abused children are abused by someone with whom they have an ongoing relationship. The abuser can control the child through either physical power, a position of authority, or threats of negative consequences if the child reveals the abuse. These factors explain why children often keep the abuse as a secret. It was common for the child's family not to realize that the sexual abuse was happening.

Dr. Urquiza was asked a hypothetical question, where an abuser might cry and warn the victim that he would lose his own child if the abuse was reported. Urquiza testified that such conduct could contribute to secrecy. A similar situation would exist if the child feared disclosure might lead to a parent's relationship against the abuser.

16.

Dr. Urquiza testified the second component was helplessness, which addressed the misconception that victims will do something to prevent continuing abuse. The child might not see any other option but to submit to the abuse if the abuser has physical, mental, or authoritative control over the child. The child's feeling of helplessness would also occur if the abuser had a close relationship with the child's parent.

Dr. Urquiza testified the third component was entrapment and accommodation. As a result of secrecy and helplessness, the abused child is trapped in the abusive relationship and takes steps to accommodate or cope with the reality. The child will suffer from trauma and humiliation, but will disassociate from or compartmentalize her experiences. In response to another hypothetical, Dr. Urquiza testified it would not be uncommon for a 13 or 14-year-old abuse victim to still have pleasant moments with her abuser.

The fourth component was delayed or unconvincing disclosure. Dr. Urquiza testified that there was a misconception that abused children will report the abuse right away. This component also addresses the situation when the child's disclosures include inconsistencies, which result from having difficulty speaking about sexual acts. The child's ability to disclose relies on the child's comfort-level with the person they are speaking to, and the circumstances surrounding the disclosure. The initial disclosures often include less detail than subsequent disclosures.

Dr. Urquiza was not asked and did not testify about the fifth component of retraction or recantation.

Dr. Urquiza was asked about research on false reporting. He testified that false allegations occur and are a problem. He said there were multiple studies that showed

false reports occurred in one percent of studied cases on the "low end," and six percent of the studied cases on the "high end."[10]

**Convictions and Sentence**

As explained above, defendant was charged with 18 felony counts but only convicted of two counts: count XIII, rape of a child under the age of 14 years (the last time before K.'s 14th birthday), committed between March 1 and August 26, 2012 (§ 269, subd. (a)(1)); and count XVII, forcible rape (after K.'s 14th birthday), committed between August 27 and November 30, 2012 (§ 261, subd. (a)(2)).

The jury found defendant not guilty of count XII, kidnapping to commit lewd or lascivious acts (the incident when he dragged her into his bedroom and sexually assaulted her).

The jury was unable to reach verdicts on the remaining 15 counts. The court declared a mistrial and granted the prosecution's motion to dismiss the charges.

On March 4, 2014, the court denied probation and sentenced defendant to 15 years to life for count XIII, and a consecutive upper term of 11 years for count XVII.[11]

## DISCUSSION

**I.    Evidence of Defendant's Statements About the Victim's Friend**

Defendant contends the court abused its discretion when it granted the prosecution's motion to introduce Karen's testimony about defendant's sexually-related statements regarding K.'s teenage friend, T. Defendant argues the evidence was not relevant to any disputed issue, highly prejudicial, and violated his due process rights.

---

[10] In issue III, *post*, we will address defendant's contention that his defense attorney was ineffective for failing to object to Dr. Urquiza's testimony about the rate of false reports.

[11] At the sentencing hearing, Karen addressed the court and said K. had attempted suicide in January 2014, and she was diagnosed with PTSD because of defendant's sexual assaults.

18.

## A.    Background

During Karen's direct examination testimony, the prosecutor asked her whether K. had been involved in the school's color guard.  Defense counsel objected on relevance grounds.  A sidebar discussion was held off the record.

At the conclusion of that day's testimony, the court held a hearing outside the jury's presence on defense counsel's objection.  The prosecutor made an offer of proof that defendant made an inappropriate comment about K.'s 17-year-old friend from the color guard.  The court decided to conduct a hearing pursuant to Evidence Code section 402 on the admissibility of this evidence.

## B.    Evidentiary Hearing

At the evidentiary hearing, Karen testified about the incident when T. stayed overnight with K.  Karen thought it happened during football season, between August and December 2012, when they were in color guard.  T. was 16 years old and about to turn 17 years old.  K. and T. were very close.  After T. had spent the night, Karen and defendant drove both girls to T.'s house the next morning.  During the drive, the four of them were laughing and making fun of their color guard uniforms, which were "full on spandex body suit[s]" that were extremely form-fitting.  Karen testified that "because of the size of [T.'s and K.'s] breast[s] they were uncomfortable."  Karen was not sure if the girls were wearing their uniforms during the drive.

Karen testified that when they arrived at T.'s apartment, both K. and T. got out and walked to the door.  Karen and defendant were not talking when the girls got out of the car.  Defendant suddenly said about T., " 'Damn, if I was her age I would be all up in that ass.' "  Karen looked at him and "asked him why would you say that, she is a child."  Defendant "was like, well, I said if I was that age I would be tapping that."  Defendant added that Karen knew "that he likes people with big round butts."  Karen testified defendant "was excited and couldn't sit still," and he was moving his legs around.

19.

## C. The Court's Ruling

The prosecutor argued the evidence was admissible to show defendant's "state of mind in sexual interests in young women," it was "obviously just an inappropriate statement," and it showed "what his mental state is with respect to this type of female." Defense counsel replied the evidence was not relevant or probative since defendant simply talked about "[h]ow he would act if he was 17. How 17 year old boys act, which is not him," and he did not express any current interest in minor girls.

The court held Karen's testimony about defendant's statement was admissible:

> "It appears to me that those two statements under the context in which [Karen] indicated they were given, and essentially volunteered unrelated to the conversation that they were having and seemed out of context. She described [defendant] at the time as being excited, having a difficult time sitting still, and I think listening to the tone and the inflection she gave, particularly when she said the word damn, which had a loud emphasis and was drawn out, and then indicating he had a large smile. It seems to me these statements do clearly show a sexual interest and sexual appreciation of teenage girls. Free to argue whether or not that was the qualifying phrase of if I were her age somehow defeats that, it is up to the jury whether they believe that qualification was true, or merely a smoke screen. It appears to me that the statements occurred between August and December of 2012, at the same time as the sexual assaults that are alleged in the charges here with a victim of similar age. It appears to me that through the pretrials we have had the defendant has consistently asserted to his attorney that the victim was untruthful, and the accusations are motivated by a jealousy towards him and his adult female friends. And the statement appears to me to be admissible regarding first the defendant's motive to sexually assault the victim, as well as it seems to me it specifically relates to the specific intent to arouse, to appeal to, or gratify the lust, passions, or sexual desires of the defendant, which are significant elements in most of the [section] 288 type charges in this case. So it appears to me that that is an admissible amount. And I will allow that testimony to proceed."

The court also determined the probative value of defendant's statement to Karen was greater than the danger of undue prejudice.

At trial, Karen testified about this incident as set forth in the factual summary above.

### D.    Evidence of Prior Acts

"Character evidence, sometimes described as evidence of propensity or disposition to engage in a specific conduct, is generally inadmissible to prove a person's conduct on a specified occasion.  (Evid.Code, § 1101, subd. (a).)  Evidence that a person committed a crime, civil wrong, or other act may be admitted, however, not to prove a person's predisposition to commit such an act, but rather to prove some other material fact, such as that person's intent or motive.  (*Id., § 1101, subd. (b).*)"  (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1095.)  Such evidence is not limited to criminal conduct, "but may encompass any wrong or other act."  (*Id.* at p. 1100, fn. omitted.)

"The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent.  [Citation.]  '[T]he recurrence of a similar result ... tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish ... the presence of the normal, i.e., criminal, intent accompanying such an act ....'  [Citation.]  In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]'  [Citation.]"  (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.)

When the defendant's prior acts are introduced to prove motive, the probative value of the uncharged conduct as evidence of motive does not necessarily depend on the similarities between the charged and uncharged conduct, provided there is a direct logical nexus.  (*People v. Demetrulias* (2006) 39 Cal.4th 1, 15.)

"A trial court may exclude otherwise relevant evidence if its probative value is substantially outweighed by the probability that its admission will be unduly prejudicial.  [Citation.]  'Prejudice,' as used in Evidence Code section 352, is not synonymous with

21.

damaging.  [Citation.]  Rather, it refers to evidence that uniquely tends to evoke an emotional bias against the defendant as an individual, and has little to do with the legal issues raised in the trial.  [Citation.]" (*People v. McCurdy*, *supra*, 59 Cal.4th at p. 1095.)

On appeal, the court's resolution of these evidentiary issues is reviewed for an abuse of discretion.  (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 405.)  A court abuses its discretion when its ruling falls outside the bounds of reason.  (*People v. Kipp* (1998) 18 Cal.4th 349, 371.)

### E.    Analysis

Defendant argues his statements about T. were improperly admitted as character and propensity evidence, and the evidence was irrelevant and highly prejudicial.  To the contrary, the evidence was admissible, extremely relevant, and probative of defendant's motive and intent pursuant to Evidence Code section 1101, subdivision (b), given the nature of the charges, K.'s description of the sexual assaults, and defendant's pretrial statements to Detective Balderama.

Defendant was charged with 18 felony counts for sexually assaulting K. on numerous occasions, beginning when she was 13 years old and finally ending after she turned 14 years old.  The charges including forcible lewd acts, unlawful sexual intercourse, rape, and oral copulation.  K. described defendant demonstrating his sexual pleasure as he committed these acts against her.

While defendant did not testify, his pretrial statements to Detective Balderama were introduced by the prosecution.  Defendant denied having sex with K., but claimed that K. flirted with him and made him feel uncomfortable.  Defendant declared:  " 'I am a 36 year old man, I know when somebody is trying to flirt or get my attention.  I know that little girl tried a couple times to get my attention.' "  When Balderama confronted defendant with the ruse about DNA evidence, defendant insinuated that K. fabricated the evidence by obtaining certain objects from his bedroom.

Defendant asserts that his statements were not relevant or probative because T. was not K. However, Karen's testimony about defendant's spontaneous assertion of his sexual interest in T., and his physical reaction to looking at T.'s body, was relevant to show his state of mind, intent and motive to commit the charged offenses. T. and K. were close friends, teenagers, and T. was often at K.'s house. Both girls regularly wore their form-fitting uniforms which highlighted their body types. Defendant had numerous opportunities to see T., and his statements were indicative of sexual interest in a teenage girl. As noted by the trial court, defendant expressed his sexual interest and attraction to a teenage girl at the same time that he was alleged to be sexually molesting the teenage victim. The evidence was relevant to his motive and intent to commit the charged offenses because the jury could have inferred he had a sexual attraction to young girls. (See, e.g., *People v. Memro* (1995) 11 Cal.4th 786, 864–865; *People v. Page* (2008) 44 Cal.4th 1, 5.) Defendant reacted to Karen's disapproval by trying to modify his statement and claimed he would only be interested in T. if he was her age. Such a condition went to the weight rather than the admissibility of his statements.

We also reject defendant's claim that the evidence was prejudicial. In the factual statement, *ante*, we have set forth K.'s testimony about defendant's sexual assaults in support of the numerous charged offenses. Defendant's statements about T. were "no more inflammatory than testimony concerning the charged offenses. This circumstance decreased the potential for prejudice, because it was unlikely … that the jury's passions were inflamed by the evidence of" his prior statements. (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 405.) The nature of the verdicts indicate the jury carefully considered each count, and did not rely on such evidence to conclude defendant committed all the charged offenses.

Finally, defendant complains the court failed to instruct the jury that his statements about T. were admitted for a limited purpose. In the absence of a defense request, the court did not have a sua sponte duty to so instruct. (*People v. Freeman* (1994) 8 Cal.4th

23.

450, 495.)  Defense counsel may have opted against requesting such an instruction to avoid emphasizing the evidence, "especially since it was obvious for what purpose it was being admitted."  (*Ibid*.)  There were no allegations that defendant committed any offenses against T., but it was clear that the evidence was admitted to show his state of mind, intent and motive based on his sexual interest in another teenage girl.[12]

## II.    Admission of Defendant's Statements to Detective Balderama

Defendant testified the court should have excluded a portion of his pretrial interview with Detective Balderama, when he falsely told defendant that K. had turned over a sample of defendant's semen and asked how that might have happened, and defendant insinuated K. took his collection of women's underwear.  Defendant argues this evidence was unduly prejudicial and violated his due process rights.

### A.    Background

Defendant filed a pretrial motion in limine to exclude his statements to Detective Balderama about his collection of women's underwear.  The prosecutor argued the evidence was relevant to show defendant's consciousness of guilt in response to Balderama's false statements about the semen sample.  The evidence was also relevant because the jury "needs to see how he is back peddling [*sic*], and trying to provide an explanation as to how his DNA would have been found in [K.'s] underwear."

Defense counsel replied that defendant's statement was not relevant because there was never any DNA evidence.  Detective Balderama falsely told him K. had produced a sample of his DNA, asked him to speculate how she got it, and defendant's answer was pure speculation.  The prosecutor responded that defendant's answer showed that he was not truthful; that his response "in and of itself show that he had concocted this answer to

---

**12** The jury received CALCRIM No. 303, that certain evidence was admitted for a limited purpose and it could only consider the evidence for that purpose.  However, the court did not advise the jury that Karen's testimony on this subject was admitted for a limited purpose.

24.

this rouse [*sic*], which is common among police strategy and tactics and interviewing defendant that he had come up with this answer," and the jury should be able to determine whether he was fabricating an answer.

Defense counsel said defendant did not fabricate his answer because the district attorney's investigator interviewed Hernandez, defendant's former girlfriend, and she said defendant saved women's underwear after they had sex.

The court replied that defense counsel was assuming Hernandez's statement was true, and the jury would believe her. The court determined that Hernandez's statement about defendant's conduct went to the weight rather than the admissibility of the evidence.

### B.    The Court's Ruling

The court held defendant's statements to Detective Balderama about his underwear collection were admissible.

> "[I]t appears to me that the statement while the evidence didn't really exist if believed by the jury to be false would be relevant, because it would show that the defendant thinks that there is a possibility that his DNA could be found in the victim's underwear, and then would have to concoct a story as to why that might be, which [the prosecutor] pointed out a statement by him would create a consciousness of guilt because of the awareness that his DNA would be found in that very location. [Defense counsel's] argument when it goes to the weight of the evidence, not to its admissibility, and it is a jury determination to whether they believe the defendant's statement was or was not false, whether his explanation was true or fabricated. Under [Evidence Code section] 352 it does appear if a jury finds it to be a false statement, its probative value is not substantially outweighed by an undue consumption of court time. It does not appear to me that it is an issue that would take a lot of time to flush out or to refute by the defense. It appears that the probative value is greater than the danger of undue prejudice. Its probative value is significant and is not likely to confuse the issues or mislead the jury, so it appears to me that that statement is admissible, and I will allow it."

As set forth in the factual summary, Detective Balderama testified regarding defendant's response to Balderama's false statement about DNA evidence, and that he claimed he found his collection of women's underwear in K.'s bedroom.

In addition, Delila Hernandez testified that when they resumed their romantic relationship in August 2012, defendant asked for her underwear three separate times after they spent the night together. There was no testimony that defendant told Hernandez that he had underwear from other women.

### C. **Analysis**

We first note that Detective Balderama's use of a ruse during the interview was not inappropriate. Psychological ploys consisting of misstatements about the evidence against an accused do not, standing alone, render a statement involuntary unless they are "so coercive that they tend to produce a statement that is both involuntary and unreliable. [Citations.]" (*People v. Ray* (1996) 13 Cal.4th 313, 340; *People v. Thompson* (1990) 50 Cal.3d 134, 166–167; *People v. Tate* (2010) 49 Cal.4th 635, 684.) For example, there was no coercion when police deceptively described purported eyewitness and fingerprint evidence tying defendant to the crime (*People v. Williams* (2010) 49 Cal.4th 405, 442–443); when a detective implied to the defendant "that he knew more than he did or could prove more than he could" (*People v. Jones* (1998) 17 Cal.4th 279, 299); or when police falsely told defendant there was physical evidence which tied him to the crime (*People v. Thompson*, *supra*, 50 Cal.3d at pp. 166–167). Balderama's false statement that K. had produced DNA evidence was not coercive, it did not vitiate defendant's *Miranda* waiver, and it did not render his subsequent statements involuntary.

As in issue I, *ante*, defendant contends the court abused its discretion when it overruled his objection to his statement about his underwear collection because the prejudicial impact of the evidence outweighed any minimal probative value. Defendant argues: "The notion of someone maintaining a collection of women's underwear and then actually checking on the collection (which is how he supposedly knew the

26.

underwear was missing) is inherently a prejudicial one that has the tendency to turn a jury against that person. It smacks of deviant sexual behavior. And it created the danger that the jurors would convince themselves that [defendant] sexually assaulted [K.] not because of the evidence, but because of who he is, i.e., a sexual deviant."

We note that evidence that a male suspect has collected, possessed, or even worn women's underwear has been found relevant, probative, and not prejudicial in far more disturbing situations than the circumstances in this case. (See, e.g., *People v. Harlan* (1990) 222 Cal.App.3d 439, 445–446; *People v. Robertson* (1982) 33 Cal.3d 21, 52; *People v. Clark* (1992) 3 Cal.4th 41, 124–125.) Thus, the premise of defendant's statement to Detective Balderama – that he collected women's underwear – was not so inherently prejudicial as to require exclusion if otherwise relevant and probative.

The court did not abuse its discretion when it overruled defendant's objections to this evidence, particularly given the entirety of defendant's statements during the interview with Detective Balderama. Balderama asked defendant why he moved out of Karen's house. Defendant said he had resumed his relationship with his former girlfriend, and he was scared that Karen's ex-husband would find out about his sexual relationship with Karen and kill him. Without being asked about K., defendant then added a third reason – that K. flirted with him and made him feel uncomfortable. When Balderama asked defendant to explain what K. did, defendant claimed that "little girl" flirted with him and tried to get his attention. Once being advised of the charges, defendant denied having sex with K. and asserted that K. fabricated the allegations so she could move out of Karen's house. Defendant offered contradictory statements about whether K. had walked into the bathroom while he was taking a shower and saw his body.

Under these circumstances, defendant's response to Detective Balderama's ruse about the DNA evidence was relevant and probative of his consciousness of guilt. " 'False statements regarding incriminating circumstances constitute evidence which may

support an inference of consciousness of guilt.' [Citation.]" (*People v. Beyah* (2009) 170 Cal.App.4th 1241, 1249.) He had already blamed K. for flirting with him and claimed she fabricated the charges simply because she wanted to leave Karen's house. Defendant now claimed that K. also fabricated the DNA evidence by entering his bedroom and either tampering with his underwear collection or taking a towel from which she could have obtained a sample of his semen. Defendant's statements were relevant and probative not because defendant said he collected women's underwear, but because the evidence demonstrated defendant's strategy of blaming K. for framing him for the crimes.

Defendant's response to Detective Balderama's ruse was far less inflammatory than K.'s description of the numerous sexual assaults. His statements were somewhat corroborated by Hernandez, who confirmed that he asked for her underwear after they resumed their relationship. However, Hernandez's corroboration did not reduce the probative value of defendant's statements or demonstrate that he actually had accrued such a collection and was not telling a falsehood. While he may have collected women's underwear, defendant's statements to Balderama were relevant and probative because he claimed K. removed the items from his bedroom and fabricated the evidence which she purportedly gave to the police.

## III.    Ineffective Assistance; Failure to Object to Expert Testimony

Defendant raises an ineffective assistance claim based on defense counsel's failure to object to Dr. Urquiza's testimony about CSAAS and low frequency of false reports. Defendant argues Dr. Urquiza's testimony invaded the province of the jury to determine the credibility of the victim and other witnesses.

"In order to demonstrate ineffective assistance, a defendant must first show counsel's performance was deficient because the representation fell below an objective standard of reasonableness under prevailing professional norms. [Citation.] Second, he must show prejudice flowing from counsel's performance or lack thereof. Prejudice is

28.

shown when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  [Citation.]"  (*People v. Williams* (1997) 16 Cal.4th 153, 214–215.)

"An attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel.  [Citation.]"  (*People v. Kelly* (1992) 1 Cal.4th 495, 540; *People v. Rivas-Colon* (2015) 241 Cal.App.4th 444, 451.)  "Generally, failure to object is a matter of trial tactics as to which we will not exercise judicial hindsight....  A reviewing court will not second-guess trial counsel's reasonable tactical decisions.  [Citation.]"  (*People v. Kelly*, *supra*, 1 Cal.4th at p. 520; *People v. Riel* (2000) 22 Cal.4th 1153, 1185.)  "[W]here counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions.  [Citations.]"  (*People v. Weaver* (2001) 26 Cal.4th 876, 926.)

## A.    Dr. Urquiza's Testimony

Defendant's ineffective assistance claim is based on the following sequence from Dr. Urquiza's testimony.  On direct examination, the prosecutor asked him about research on false reports of child sexual abuse.  Dr. Urquiza replied:

> "There is a caveat here which it is really hard to do research with children.  It is hard to do research with children that have been sexually abused in which the allegation they made wasn't true, false allegations.  We know that false allegations happen, and they are a problem.  What we have done over the last couple of decades is there is probably about 15 good research studies about false allegations, and the range of those studies, the frequency is as low as about one percent of cases are determined to have been false allegation, the high is about six percent of cases.  I often reference a Canadian state, one of the best studies and one of the most recent studies they had some 100 and some cases in which they found about four percent of cases where the child had disclosed being sexually abused was determined to have been a false allegation.  So I often refer to it as something that happens, but very infrequently or rarely.  What is interesting

29.

in that Canadian four percent, which is roughly between one and six percent is that in none of those cases was it the child who made the allegation that was determined to be false, and actually the article, the title of the article is really about how custodial disputes are one of the situation in which false allegations of sexual abuse come up. And that is – a stereotypical situation would be mom and dad get separated and divorced, and one of the things that you can do if you want to get custody of a child is make an allegation of abuse. And their hypothesis is that is one of the situations where that relatively small percentage of cases came up, but it wasn't the child who made the allegation it was a parent who made the allegation."

Defense counsel did not object to this response.

Defense counsel began cross-examination by asking Dr. Urquiza about the percentages he had just cited. Dr. Urquiza said the one to six percent figures were based on cases in which law enforcement or child protective services had reached a conclusion that the allegations were false.

Defense counsel asked Dr. Urquiza about how cases which lacked physical evidence, and involved "he-said-she-said" situations, could be scientifically determined as false. Urquiza explained that false determinations were legal and not scientific.

"So as a researcher I am not going to come in here as an expert witness who does research in child sexual abuse and say somebody is innocent or somebody is guilty, because it is not a scientific science issue…."

Dr. Urquiza conceded there was no way to determine whether someone was lying. There was no hard data on the actual number of false allegations, but the rates were found to be "relatively low or even rare" in several different studies.

Defense counsel asked Dr. Urquiza if he was familiar with the work of the Innocence Project, in cases where people were convicted of sexual offenses and were later exonerated by DNA tests. Dr. Urquiza said he was not familiar with the Innocence Project and did not deal with DNA evidence.

"As a scientist I can't get into the issue as to whether a child is abused or not abused. And even here today you will not hear an opinion from me about this case as to whether somebody was abused or not, or whether

30.

somebody is a perpetrator or not, that is not my job. And I hope not to have conveyed that in any way. [¶] That responsibility is the responsibility of the jury."

## B.     Instruction

The jury received CALCRIM No. 1193, that Dr. Urquiza's testimony on CSAAS was "not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not [K.'s] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

## C.     CSAAS Testimony and Credibility

Expert opinion testimony is admissible if it relates "to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact" and it is based on information "of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates...." (§ 801.)

"Although inadmissible to prove that a molestation occurred, CSAAS testimony has been held admissible for the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts to a molestation. [Citations.]" (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744; *People v. Wells* (2004) 118 Cal.App.4th 179, 188; see *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300; *People v. Brown* (2004) 33 Cal.4th 892, 905–906.) The admission of expert testimony about CSAAS has been consistently upheld as long as a limiting instruction is given. (*People v. Patino*, *supra*, 26 Cal.App.4th at pp. 1744–1745; *People v. Housley* (1992) 6 Cal.App.4th 947, 955–958.)

Defendant argues defense counsel was prejudicially ineffective for failing to object to Dr. Urquiza's direct examination testimony about the percentage of false reports because his testimony amounted to an opinion K.'s accusations were true and defendant was guilty, and he vouched for the victim's credibility and truthfulness.

A lay witness's opinion about the veracity of another person's particular statements is inadmissible and irrelevant on the issue of the person's credibility because it

31.

invades the province of the jury as the ultimate fact finder. (*People v. Melton* (1988) 44 Cal.3d 713, 744; *People v. Zambrano* (2004) 124 Cal.App.4th 228, 239–240.) Similarly, the veracity of those who report crimes to the police is not a proper subject of expert testimony. (*People v. Sergill* (1982) 138 Cal.App.3d 34, 39–40.)

In this case, however, Dr. Urquiza made it clear he was not vouching for the victims, or telling the jury whether someone was innocent or guilty. His testimony about CSAAS and studies about false allegations was very general and did not address any facts in this case. Dr. Urquiza never testified that children never lie about sexual abuse and admitted that sometimes children make false allegations. He never said that he interviewed K. or reviewed her statements about the charges. He never expressed a personal belief about the credibility of either the defendant or K. Indeed, he made it clear that he was not giving an opinion about the charges in this case, "whether somebody was abused or not, or whether somebody is a perpetrator or not, that is not my job," and that it was "the responsibility of the jury." By his own words, he expressed limitations on the use of his description of statistics to reach any conclusions about the specific facts in this case.

A contrasting situation was presented in *Snowden v. Singletary* (11th Cir. 1998) 135 F.3d 732, where an expert testified that he had interviewed one of three complaining child witnesses, who was the only child who testified against the defendant. The expert also testified that 99.5 percent of child victims tell the truth about sexual abuse allegations and, in his personal experience, he had never personally encountered a child who had fabricated abuse allegations. *Snowden* held the expert's testimony violated the defendant's due process rights because he "forcefully" vouched for the children's credibility, and his testimony about the high percentage of truthful accusers included the particular victim in that statistic since he had examined the child. (*Id*. at pp. 737–739.)

We find that since Dr. Urquiza's testimony did not amount to vouching, defense counsel was not ineffective for failing to object. We also find that to the extent that

counsel could have objected to his testimony about false reports, the record shows that counsel instead opted to cross-examine Dr. Urquiza, and obtained his concession that he was not offering an opinion about whether someone was sexually abused, that such determinations were the jury's responsibility, and there was no hard data on the actual number of false allegations.

## **DISPOSITION**

The judgment is affirmed.

_____
POOCHIGIAN, J.

WE CONCUR:


_____
HILL, P.J.


_____
KANE, J.